JERRY COSTELLO, Plaintiff-Appellee, v. CAPITAL CITIES COMMUNICATIONS, INC., *et al.*, Defendants-Appellants.

Fifth District No. 5—85—0236

Opinion filed March 11, 1987.

STEIGMANN, J., dissenting.

Robert J. Hayes, of Hayes, Murphy & Hayes, of Belleville, and Robert B. Hoemeke, John M. Hessel, and Joseph E. Martineau, all of Lewis & Rice, of St. Louis, Missouri, for appellant Capital Cities Communications, Inc.

Richard O. Erdmann, of Law Offices of Richard O. Erdmann, of Fairview Heights, for appellant Richard Hargraves.

Amiel Cueto, of Cueto, Daley, Williams & Moore, Ltd., of Belleville, for appellee.

JUSTICE JONES delivered the opinion of the court:

Defendants, Capital Cities Communications, Inc., and Richard Hargraves, appeal a judgment of the circuit court of St. Clair County rendered in a trial before the court sitting without a jury in the amount of $1,050,000. The judgment encompassed an award of actual damages in the amount of $450,000 and punitive damages in the amount of $600,000. Plaintiff's action was for libel. The defendant Capital Cities Communications, Inc. (Capital Cities), is the owner of the Belleville News-Democrat (News-Democrat), a newspaper of general circulation in St. Clair County. The defendant Richard Hargraves was the editor of the editorial page of the News-Democrat. The plaintiff, Jerry Costello, was, at the time of the publication of the article in question, the elected chairman of the St. Clair County board. The case is before us for a second time, a fact we will detail later in this opinion.

In 1980 there was an issue before the residents of St. Clair County regarding funding for the Metro East Mass Transit District, an instrumentality of the Bi-State Development Agency. That agency was created by a compact entered into between the States of Illinois and Missouri to afford a joint approach to concerns of mutual interest to the municipalities and counties of the metropolitan St. Louis area. The counties of St. Clair, Madison, and Monroe are Illinois counties encompassed by the compact. (Cf. Ill. Rev. Stat. 1979, ch. 127, par.

63s—1 *et seq.*) The Bi-State Development Agency (Bi-State) furnished public transportation to the urban areas of the St. Louis metropolitan area, including the three Illinois counties associated with the agency.

The method of funding for the mass transit system became a much debated subject, and various proposals were advanced to accomplish the purpose. In the summer of 1980 the Illinois legislature enacted an amendment to the Local Mass Transit District Act (Ill. Rev. Stat. 1979, ch. 111⅔, par. 351 *et seq.*) that gave to the county boards of Madison, Monroe, and St. Clair counties the authority to create transit districts that would be governed by a board of trustees appointed by the respective chairmen of the county boards. Among the powers conferred upon the trustees was the power to impose a sales tax of up to ¼ of 1%, the proceeds of which would be used to subsidize public transportation. (Ill. Rev. Stat. 1979, ch. 111⅔, par. 355.) The News-Democrat was adamantly opposed to the imposition of any tax for the public transportation system unless and until such tax was approved by the voters in an advisory referendum. An editorial in the issue of September 15, 1980, expressed this viewpoint.

In the general election in the fall of 1980, the plaintiff was a candidate for the office of chairman of the county board of St. Clair County. Sometime in September 1980 the plaintiff was invited to an interview with the editorial board of the News-Democrat. The purpose of the interview was stated to be for consideration of an endorsement of the plaintiff's candidacy. The meeting was held at the office of the paper. Present were plaintiff, defendant Hargraves, Steven Pounds, a reporter, and, at times, Darwin Wile, publisher of the News-Democrat. The parties' accounts of what transpired at the meeting differ. The discussions were apparently wide-ranging but were within the ambit of local governmental concerns and plaintiff's position regarding taxation. Plaintiff testified:

> "There was a general discussion about my position on a need for new taxes for any purpose; and my position was at that time, as I told the Editorial Board, Mr. Hargraves and whoever was present when the topic came up, that I was not in favor of any new tax for any reason during my first term of office without a referendum."

Defendant Hargraves gave testimony regarding his impression of the content of the meeting. He related that plaintiff told them that the new county chairman had to be a different type "because the law had been changed *and the incoming county board chairman would not have a vote on the board.*" (Emphasis added.) He then stated that plaintiff had told them that he had political clout and influence in St.

Clair County to get things done:

"He [plaintiff] was opposed to the imposition of a transit tax without a referendum of the people. He said that—no new taxes without a referendum of the people. *** He was going to vigorously use the political clout that he would have as County Board Chairman and personally to oppose that—the imposition of that tax without a referendum. He left that impression with us, and we believed him."

The testimony of Darwin Wile was similar to that of Hargraves. He stated that plaintiff had told them

"he would do everything he could to oppose any tax increases without some kind of public referendum. When he said that, it became very important to me. And in my mind, he was stating a position, he was making a commitment to do everything he could to oppose tax increases."

Wile also stated that plaintiff had told them that he was going to be a strong county board leader and that "he not only had the will to oppose taxes, he had the ability to deliver on that."

In an editorial on October 19, 1980, the News-Democrat strongly endorsed plaintiff as the candidate for chairman of the county board, citing, among other things, his opposition to any new taxes without a referendum.

In the November election that followed, plaintiff was elected by a wide margin. The first meeting of the county board that was presided over by plaintiff as the newly elected chairman was held on December 29, 1980. A proposition to create the transit district and direct the appointment of trustees was on the agenda. A committee of the board, designated by plaintiff's predecessor in office to study the advisability of creating the district, had recommended its adoption. The record details the considerable efforts of plaintiff to defeat the motion for adoption or, at least, to forestall board action on the motion until an advisory referendum could be held. His efforts included lobbying with board members and various local officials and influential politicians. On the day of the December 29 board meeting, plaintiff met with another vocal opponent of the measure, board member Hickey, to prepare a motion to table any action on the measure until April 1981 to afford time to submit the measure to the voters in an advisory referendum. At the meeting of the board that evening, a proponent of the measure made a motion for adoption of a resolution creating the district. By prearrangement plaintiff then recognized Hickey, who presented the motion to table. Also by prearrangement, plaintiff's brother, another member of the board, seconded Hickey's motion to

table. Upon vote being taken, the motion to table was defeated 22 to 6. The motion to create the district was then called for a vote, and it was adopted by the same margin, 22 to 6. Plaintiff did not speak to the board in opposition to the measure, and he did not vote against it. As presiding officer, he was prevented from doing so by the code that governed the conduct of the board's business. Plaintiff's position as chairman of the board limited him to serving as presiding officer and parliamentarian. Reporter Pound of the News-Democrat was present throughout the meeting.

In a section of the News-Democrat of December 31, 1980, designated as "Opinions," two editorials addressed the December 29 creation of the Metropolitan Transportation System by the county board of St. Clair County. The editorials were carried under the subtitle of "Our Viewpoint." The first to appear was bitterly and sarcastically critical of the action of the board for its adoption of the resolution creating the district. This editorial furnished some of the background events that led to the adoption of the resolution and gave some indication of the momentum behind the proposal as it was presented to the board for action. The second of the editorials is the one that gave rise to this case:

# Costello blew his first chance

Jerry Costello lied to us.

There's no nicer way to put it; he simply lied. And, when he lied to us, he lied to you.

He said he was going to be a tough county board chairman, especially when board members wanted to spend taxpayers' money.

He said he would militantly oppose the implementation of any new tax without first seeking the voters' approval through a referendum.

He said he would lead the County Board down the proper paths, protecting the rights of the taxpayers.

Well, he lied.

He didn't do any of those things Monday night, thereby breaking his most sacred campaign promise at his very first meeting.

The County Board had an opportunity to conduct a binding referendum, asking you if you wanted to pay a new sales tax to support the Bi-State bus system. That's the very thing Costello had pledged he would do. He had promised, in the strongest possible terms, that he would let the voters decide.

But when the time came to make a decision, he was up there sitting on his gavel.

Some leader!

You couldn't tell him from any other politician in the bunch. He did absolutely nothing to protect your interests.

To say we're disappointed is too mild; we're irate. We supported Costello's election because of what he said to us. We told you what he said and how we thought he was different from the run-of-the-mill, Touchette-dominated Democrats of the past.

Now we wonder if we didn't lie to you.

Maybe Costello isn't different.

Maybe Costello didn't mean any of the things he. said.

Maybe his opponent, Republican Larry Reinneck, was right when he said Jerry Costello was nothing more than another patronage-oriented political hack.

How are we supposed to tell otherwise?

Jerry Costello asked for a chance to prove himself and, in his very first meeting, he blew it.

Just think, we've got two more years of the Costello brand of lying leadership.

Doesn't that thrill you?

— RICHARD N. HARGRAVES

As appears, this editorial was signed by defendant Richard Hargraves. Hargraves testified that he had consulted with publisher Wile in the writing. They had, Hargraves stated, decided to criticize the

board

"who did not choose to give the people a vote in the creation—in the imposition of this tax; and the second one Mr. Wile and I decided needed to criticize Mr. Costello for not providing the effective vigorous leadership he had promised to provide."

Hargraves then testified that he had written an editorial regarding plaintiff and had submitted a draft of it to Wile.

"And then he [Wile]—He said that—that that wasn't strong enough, that he thought that Mr. Costello had lied to us and that we had to take a much more vigorous criticism of him, that he didn't want Mr. Costello to think that he could—that he could get away with this type of thing and get the newspaper's support again."

Hargraves also stated that he had talked to four people before writing the item: reporter Pound, Wile, and, by telephone, board members Hickey and Anderson.

In his testimony on direct examination as part of defendants' case, Wile testified that he had participated in the drafting of the editorial critical of plaintiff. He was then asked this question and gave this reply:

"Q. Do you recall specifically any conversation pertaining to the use of the word 'lie' in the editorial?

A. Yes, I do. Mr. Hargraves brought a draft of the editorial back to me, and I read it; and I thought that it was very important that we point out that Mr. Costello had lied to us. I instructed Mr. Hargraves to include that in the editorial, and he subsequently did."

On January 4, 1981, plaintiff wrote a letter "To the Editor" of the News-Democrat. It stated that it was in response to the December 31, 1980, editorial and that because of the shrill, personal attack upon his integrity he would direct his response to the readers, not to Mr. Hargraves. The content of the letter was a review of his often-stated opposition to the creation of the mass transit district and the imposition of a tax without an advisory referendum. It was highly critical of the treatment he had received at the hands of the News-Democrat and of the misrepresentation of what had transpired at the endorsement meeting on September 15, 1980. The letter closed by stating that the law does not permit knowing, false assaults upon a person's integrity and that "it is through the law I will seek my redress." Plaintiff's response to the editorial was never published by the News-Democrat. Wile stated that the reason it was not published was its concluding threat of a lawsuit over the editorial.

As promised in his letter to the editor, plaintiff brought this action in libel against Capital Cities and Hargraves. The circuit court sustained a motion to dismiss the complaint and entered judgment for the defendants. Plaintiff appealed, and we considered as the sole issue in the case whether the complaint was sufficient to state a cause of action. Resolution of that issue turned upon whether the editorial published on December 31, 1980, constituted libel *per se.* We held that it did, and we reversed the judgment dismissing the complaint and remanded the case for further proceedings. (*Costello v. Capital Cities Media, Inc.* (1982), 111 Ill. App. 3d 1009, 445 N.E.2d 13.) (The name of Capital Cities was changed after the decision in the first appeal.) The trial upon remand and the resulting judgment for $1,050,000 occurred as we have described above, and we now consider the defendants' appeal. Defendants raise four issues: (1) whether the statement that "Costello lied to us" was protected opinion, (2) whether, in any event, the evidence failed to show a clear and convincing case of actual malice or falsity, (3) whether, considering the evidence, the editorial was not libelous *per se,* and (4) whether the damages awarded were excessive and violative of constitutional precepts.

■ Recovery for a defamatory statement concerning a public official may be allowed only if it is established by clear and convincing evidence both that the utterance is false and that it was made with knowledge of its falsity or in reckless disregard of whether it was false or true. *New York Times Co. v. Sullivan* (1964), 376 U.S. 254, 11 L. Ed. 2d 686, 84 S. Ct. 710; *Wanless v. Rothballer* (1986), 115 Ill. 2d 158, 503 N.E.2d 516.

■ In *St. Amant v. Thompson* (1968), 390 U.S. 727, 20 L. Ed. 2d 262, 88 S. Ct. 1323, the Supreme Court restated the *New York Times* test to be that the plaintiff in a defamation action must prove that the defamatory publication was made with actual malice—that is, with knowledge that it was false or with reckless disregard for whether it was false or not. (*Tunnell v. Edwardsville Intelligencer, Inc.* (1969), 43 Ill. 2d 239, 252 N.E.2d 538.) The reckless disregard for the truth that is requisite to a proof of malice is described in terms of the subjective frame of mind of the actor, and recklessness is said to exist only where a defendant in fact entertained serious doubts as to the truth of his publication. (*St. Amant v. Thompson* (1968), 390 U.S. 727, 20 L. Ed. 2d 262, 88 S. Ct. 1323; *Wanless v. Rothballer* (1986), 115 Ill. 2d 158, 503 N.E.2d 516; *Catalano v. Pechous* (1980), 83 Ill. 2d 146, 419 N.E.2d 350; *cf. Tunnell v. Edwardsville Intelligencer, Inc.* (1969), 43 Ill. 2d 239, 247, 252 N.E.2d 538, 541.) We are aware, too, that "[j]udges, as expositors of the Constitution, must independently

decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of actual malice." *Bose Corp. v. Consumers Union of United States, Inc.* (1984), 466 U.S. 485, 499-500, 80 L. Ed. 2d 502, 516, 104 S. Ct. 1949, 1959; *Wanless v. Rothballer* (1986), 115 Ill. 2d 158, 503 N.E.2d 516.

In the first appeal of this case, the defendants argued that under the "innocent construction" rule the language of the editorial should be found to be not libelous. In the instant appeal defendants only mention the innocent-construction rule, preferring to place their emphasis upon the claim that the editorial is constitutionally protected expression of an opinion. Defendants state:

> "In determining whether such protection exists, the Court must be guided by the innocent construction rule which requires that the statement 'be considered in *context*, with the words and the implications therefrom given their natural and obvious meaning \*\*\*.' [Citations.] If, as so construed, the statement may reasonably be interpreted as opinion, then it is not actionable."

Defendants' position is based principally upon the case of *Ollman v. Evans* (D.C. Cir. 1984), 750 F.2d 970, *cert. denied* (1985), 471 U.S. 1127, 86 L. Ed. 2d 278, 105 S. Ct. 2662. In the *Ollman* case the court developed four factors to serve as guidelines for use in determining whether alleged defamatory statements were privileged expressions of opinion or actionable statements of fact. The *Ollman* court found justification for its "privileged expression of opinion" approach to determine whether alleged defamatory statements were libelous in the Supreme Court case of *Gertz v. Robert Welch, Inc.* (1974), 418 U.S. 323, 41 L. Ed. 2d 789, 94 S. Ct. 2977. The *Ollman* court stated:

> "In *Gertz*, the Supreme Court in *dicta seemed* to provide absolute immunity from defamation actions for all opinions and to discern the basis for this immunity in the First Amendment." (Emphasis added.) (*Ollman v. Evans* (D.C. Cir. 1984), 750 F.2d 970, 974.)

The four factors adopted in *Ollman* are: (1) the statement's precision, (2) the statement's verifiability, (3) the literary context in which the statement was made, and (4) the public context in which the statement was made.

The approach to determining whether an utterance constituted a statement of fact or merely a protected expression of opinion expressed in *Ollman v. Evans* has been adopted in a number of cases that need not be mentioned here. However, we would observe that the

implementation of the *Ollman* approach has not made a court's task in a defamation case any more simple or the decision any less susceptible of error. For instance, in *Janklow v. Newsweek, Inc.* (8th Cir. 1986), 788 F.2d 1300, 1302, the court stated: "Opinion is absolutely protected under the First Amendment. *Gertz v. Robert Welch, Inc.* (1974), 418 U.S. 323, 329, 41 L. Ed. 2d 789, 799, 94 S. Ct. 2997, 3001. But is is hard to draw a bright line between 'fact' and 'opinion.' "

Although the Illinois Supreme Court has mentioned *Ollman v. Evans* and the "protected expression of opinion" rule, it has never followed it, choosing instead to adhere to the "innocent construction rule." The Illinois innocent-construction rule was adopted in the case of *John v. Tribune Co.* (1962), 24 Ill. 2d 437, 181 N.E.2d 105, *cert. denied* (1962), 371 U.S. 877, 9 L. Ed. 2d 114, 83 S. Ct. 148, and modified in *Chapski v. Copley Press* (1982), 92 Ill. 2d 344, 352, 442 N.E.2d 195, 199. As modified, the rule states:

"We therefore hold that a written or oral statement is to be considered in context, with the words and the implications therefrom given their natural and obvious meaning; if, as so construed, the statement may reasonably be innocently interpreted or reasonably be interpreted as referring to someone other than the plaintiff it cannot be actionable *per se*. This preliminary determination is properly a question of law to be resolved by the court in the first instance; whether the publication was in fact understood to be defamatory or to refer to the plaintiff is a question for the jury should the initial determination be resolved in favor of the plaintiff."

The innocent-construction rule has since been followed by the supreme court in *Fried v. Jacobson* (1983), 99 Ill. 2d 24, 457 N.E.2d 392, and *Owen v. Carr* (1986), 113 Ill. 2d 273, 497 N.E.2d 1145. Not only has the Illinois Supreme Court not adopted the "privileged expression of opinion rule," they had occasion to criticize it (although not the *Ollman* case in particular since it had not yet been decided) in the case of *Catalano v. Pechous* (1980), 83 Ill. 2d 146, 159, 419 N.E.2d 350, 356-57:

"So stated, the contention that Pechous' statement was not defamatory reduces to the claim that when a charge of crime is based only on an inference drawn by the speaker, it must be treated *as no more than an expression of opinion* and thus ceases to be defamatory. We do not believe that such a position is supported by the language from *Gertz* on which the defendants rely. The passage, in its entirety, reads:

'Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. But there is no constitutional value in false statements of fact. Neither the intentional lie nor the careless error materially advances society's interest in "uninhibited, robust, and wide-open" debate on public issues. *New York Times Co. v. Sullivan*, 376 U.S. at 270.' 418 U.S. 323, 339-40, 41 L. Ed. 2d 789, 805, 94 S. Ct. 2997, 3007.

The argument made here would give a defendant in a defamation suit an absolute immunity rather than the limited immunity conferred by *New York Times* on a person whose defamatory statement was made without actual malice." (Emphasis added.)

In *Owen v. Carr* the supreme court referred again, in *dicta*, to the "protected expression of opinion" rule and cited the *Ollman* case. After deciding the case on the basis of the innocent-construction rule (see *Owen v. Carr* (1986), 113 Ill. 2d 273, 279, 497 N.E.2d 1145, 1148), the court stated in *dicta*:

"We observe, too, that the Supreme Court has recognized a constitutional privilege for expressions of opinion. [Citation.] Whether a statement is to be judged to be one of fact or one of opinion is a matter of law [citation], and the involved language must be considered in context to determine whether the statement should be construed to be an expression of opinion [citations]. As stated, the statements may reasonably be viewed as an expression of Carr's opinion regarding his client's allegations against Owen." (*Owen v. Carr* (1986), 113 Ill. 2d 273, 280-81, 497 N.E.2d 1145, 1148.)

In the recent case of *Stewart v. Chicago Title Insurance Co.* (1987), 151 Ill. App. 3d 888, the court followed the *dicta* in *Owen v. Carr* and *Ollman v. Evans* in deciding a libel case. We, however, believe that it is not in accord with the decisions of our supreme court on the point.

In our resolution of the issue of whether the December 31, 1980, editorial was libelous, we have followed the Illinois innocent-construction rule rather than the protected-expression-of-opinion rule of *Ollman v. Evans*. Our assessment is that the "four factors" of *Ollman*, which we have set out above, seem to be but another modification of the innocent-construction rule. They are lacking in any objective specificity. We, as apparently our supreme court does, deem the innocent-construction rule to be more easily applied and certainly

more easily understood. Any defendant in any defamation suit, no matter how shrill, acerbic, profane, or accusatorial the utterance may be, can always say, "Why, I was only expressing an opinion, and that's privileged." We do not believe the law of defamation should digress so far, as could happen if the "protected expression of opinion" rule is given full sway. The innocent-construction rule does not permit such an extreme digression.

■ We considered the first appeal of this case upon the pleadings and determined that the editorial in question constituted libel *per se*. We stated:

> "As the plaintiff points out, the editorial in the instant case repeatedly attacked him as a liar and also included an explicit reference to 'two more years of the Costello brand of lying leadership.' The language of the editorial makes it quite apparent that it was an actionable assault on the plaintiff's character in general, not mere criticism of his conduct in a particular instance. Accordingly, we find that the editorial constituted libel *per se* because it imputed to the plaintiff an inability to perform his duties and a want of integrity or lack of honesty in performing the duties of his office." (*Costello v. Capital Cities Media, Inc.* (1982), 111 Ill. App. 3d 1009, 1014, 445 N.E.2d 13, 17.)

We reversed and remanded for further proceedings to determine whether plaintiff could establish actual malice by clear and convincing evidence. The evidence and proof in the case are now before us, and our consideration of that evidence and proof compels us to reaffirm our previous determination that the editorial before us is libelous *per se* and that it was indeed published with the requisite actual malice. We are fully cognizant that there is a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide open (*New York Times, Inc. v. Sullivan* (1964), 376 U.S. 254, 11 L. Ed. 2d 686, 84 S. Ct. 710) and that candidates for public office, having "thrust themselves to the forefront of particular public controversies *** have voluntarily exposed themselves to increased risk of *** defamatory falsehood." (*Gertz v. Robert Welch, Inc.* (1974), 418 U.S. 323, 345, 41 L. Ed. 2d 789, 808, 94 S. Ct. 2997, 3010.) However, that said and considered, we have determined that the defendants cannot claim the protection afforded by the first amendment as a defense to plaintiff's action, for the editorial in question goes well beyond the bounds of protected criticism.

In our consideration of this case in the first appeal, we discussed the case of *Fried v. Jacobson* (1982), 107 Ill. App. 3d 780, 438 N.E.2d

495, and from it listed the four categories of words constituting libel *per se*. The supreme court granted leave to appeal in the *Fried* case and affirmed as to the categories of words that constitute libel *per se* in Illinois:

> "An action for defamation based on libel *per se* requires that the words used are in and of themselves so obviously and naturally harmful that proof of special damages is unnecessary. (*Zeinfeld v. Hayes Freight Lines, Inc.* (1968), 41 Ill. 2d 345, 348.) In Illinois, under the common law, four classes of words, if falsely communicated, give rise to a cause of action for defamation without a showing of special damages. They are:
>
> '1. Those imputing the commission of a criminal offense;
>
> 2. Those imputing infection with a communicable disease of any kind which, if true, would tend to exclude one from society;
>
> 3. Those imputing inability to perform or want of integrity in the discharge of duties of office or employment;
>
> 4. Those prejudicing a particular party in his profession or trade.' *Whitby v. Associates Discount Corp.* (1965), 59 Ill. App. 2d 337, 340, cited with approval in *Coursey v. Greater Niles Township Publishing Corp.* (1968), 40 Ill. 2d 257, 261." (*Fried v. Jacobson* (1983), 99 Ill. 2d 24, 26, 457 N.E.2d 392, 394.)

We held in the first appeal that in labeling the plaintiff a liar in its editorial, not once, but five times, and in concluding with "Just think, we've got two more years of the Costello brand of lying leadership," the defendants imputed an "inability to perform or want of integrity in the discharge of duties of office or employment."

As we have stated above, actual malice is established by proof that the defamatory publication was made with knowledge that it was false or with reckless disregard of whether it was false or not. Those standards have been met by the plaintiff in the case by clear and convincing evidence. It is evident that plaintiff had not lied to either the defendants or the public. Inserted between the repeated assertions that plaintiff was a liar were several charges leveled at the plaintiff that defendants either knew were untrue or showed a reckless disregard for whether they were true or false. As to those charges where defendants might profess a lack of knowledge, the truth was easily and readily ascertainable by defendants had truth been one of their concerns. The defendants stated in the editorial that plaintiff

> "said he was going to be a tough county board chairman, especially when board members wanted to spend taxpayers' money.

He said he would militantly oppose the implementation of any new tax without first seeking the voters' approval through a referendum. He said he would lead the County Board down the proper paths, protecting the rights of the taxpayers. Well, he lied."

Even when stripped of its overdrawn and exaggerated verbiage, the statement was false. Plaintiff's evidence showed that he in fact exerted every effort to defeat the creation of the mass transit district and its ensuant tax until the proposition could be submitted to the voters in an advisory referendum. Plaintiff talked to many people of political prominence and to other members of the county board, both those known to favor the proposition and those opposed to it. He lobbied with the leader of the black coalition of county board members, to no avail because the black community needed public transportation. The response from others was similar—many people were in need of public transportation and favored the creation of the mass transit district. David Hickey, a member of the St. Clair County board, during his testimony was asked whether plaintiff's position on the creation of the transit district was well known before December 29, 1980. He answered that it was "well known and widely known," that

"[h]e was avidly, vigorously opposed to the creation of any transit district without a vote in the townships, an advisory referendum in the townships affected."

Plaintiff testified that he had worked to advance his opposition to the creation of a transit district and the imposition of a tax.

"Both prior to and after the election I made my position well known through the news media. I believe as I stated in an exhibit that is here, back in January of 1980 that articles were carried in the News-Democrat. They were carried in other newspapers, through the radio stations and St. Louis television stations, that I was opposed to the creation of the transit district until after a referendum. In addition to that, I made my position very clear to members of the County Board, to public officials throughout the county and to my constituents who elected me to office."

Despite the language of the December 31, 1980, editorial, the defendants were well aware of plaintiff's activities in opposition to the transit proposition. An editorial that appeared in the November 9, 1980, issue of the News-Democrat addressed the transit issue. The editorial was under the banner "St. Clair County Board to face Bi-State bus crisis." It noted that if the transit system did not receive approval of the local funding plan by January 1, 1981, the transit sys-

tem would drastically reduce service to the East Side (including St. Clair County). The editorial mentioned plaintiff:

"Costello said he opposes any form of new tax increase without a countywide referendum. During his campaign, Costello said he would favor not abiding by the Jan. 1 deadline if a vote on the issue could be taken.

He was critical of Bi-State during the campaign, calling it 'a candidate for the most mismanaged agency.'

But some areas of the county, like East St. Louis, are big users of the bus service. Drastic cuts in service could be a hardship on East St. Louis residents who are well-represented on the County Board. ***

Costello will meet with County Board Member Darius Monken of O'Fallon and Madison County Board Chairman Nelson Hagnauer to determine if the three Illinois counties have an alternative to funding Bi-State through the sales tax.

Monken is the chairman of a County Board committee that has studied the Bi-State funding controversy."

The editorial of December 31, 1980, continued:

"He didn't do any of those things Monday night, thereby breaking his most sacred campaign promise at his very first meeting.

The County Board had an opportunity to conduct a binding referendum asking you if you wanted to pay a new sales tax to support the Bi-State bus system. That's the very thing Costello had pledged he would do. He had promised, in the strongest possible terms, that he would let the voters decide."

These statements are false. The defendants well knew that the county board did not have the authority either to impose a tax for support of the transit system or to call for a binding referendum by the voters as a method of determining whether the "new sales tax" should be imposed. Plaintiff patently never promised to defendants or anyone else that he "would let the voters decide." Such a decision was beyond not only his authority but that of the county board as well. The testimony of both Hargraves and Wile shows the above statement to be false. Moreover, editorials appearing in the News-Democrat show defendants had knowledge that, if exercised, would have prevented the December 31, 1980, attack upon plaintiff's character. There were two editorials in the "Opinions" column of the December 31, 1980, issue of the News-Democrat. The second was the attack upon plaintiff. The first was one carried under the banner "St. Clair County Board refuses to give you a chance to decide," and it

contained the following:

"While it [the proposal for creating the transit district for St. Clair County] didn't give taxing powers directly to Bi-State it did the next best thing: It let County boards create a taxing district to do the taxing for Bi-State."

This remark shows contemporary knowledge by defendants that the county board could not itself impose a tax to support the transit district.

In an "Opinions" column editorial appearing on September 15, 1980, under the banner "The voters should decide," a succinct statement was given by defendants of the method and processes to be followed in creating a mass transit district and authorizing a tax to support it:

"The people of St. Clair, Madison and Monroe counties deserve to decide for themselves if they wish a one-quarter cent sales tax imposed upon them for transit services.

But the General Assembly has denied them that right to decide.

So has Gov. James R. Thompson.

The only remaining hope is the county boards of the counties involved.

Gov. Thompson Thursday signed a measure establishing a Bi-State transit system, otherwise known as the Bi-State Bus Bail-out Bill.

The bill gives the transit district, if formed, the right to impose as much as a quarter cent sales tax in the counties. To form the district, and levy the tax, the county boards must vote to join.

Many, including State Rep. Frank Watson, R—Greenville, wanted the measure to include a referendum to let voters decide if they wanted to join and be taxed or stay out and do with limited bus service.

That's what we recommended. We still believe the voters alone should decide if they are to deal with a new tax.

Unfortunately, a majority in the General Assembly and the governor disagree.

\* \* \*

We wouldn't be surprised if the three county board chairmen, and their fellows, went ahead and implemented the plan without asking the people for their direction."

Another "Opinions" column editorial appearing on December 21, 1980, under the banner "Bi-State isn't going our way" contained this:

"The county boards in Madison and Monroe counties have given in. They've given up the fight and agreed to create Bi-State's taxing district. But St. Clair County remains uncommitted. It is the taxpayers' only hope."

All of the foregoing editorials appeared over the signature of defendant Richard Hargraves.

The attack upon defendant in the December 31, 1980, editorial continued by saying:

"But when the time came to make a decision he was up there sitting on his gavel.

Some leader!

You couldn't tell him from any other politician in the bunch. He did absolutely nothing to protect your interests.
* * *

Just think, we've got two more years of the Costello brand of lying leadership."

As we have already stated, under the rules governing the conduct of meetings of the St. Clair County board, the chairman could not speak to the issues and resolutions presented for board action; his authority was limited to serving as presiding officer and parliamentarian. Plaintiff's position before the board was established by law and was of common knowledge in the community.

Our independent review of the evidence has led to the unavoidable conclusion that the editorial attack upon the plaintiff was made with actual malice in that it was made with actual knowledge of its untruthfulness or with a reckless disregard for whether it was true or not. Articles in their own paper established the fact that the accusations leveled at the plaintiff were untrue. Defendant Hargraves talked to only four people before preparing the editorial. Of these, Hickey and Anderson were members of the county board, and they told him nothing that could serve as a factual background for the article. Hargraves did not talk to the plaintiff between the December 29 meeting of the board and the appearance of the editorial on December 31. Hargraves testified that he called plaintiff's office on December 30, was told he was "not in," and left word for plaintiff to return the call. Plaintiff testified that he was in his office all day on December 30. In either event, Hargraves made no further effort to reach plaintiff. Hargraves also talked to News-Democrat reporter Pound, who had attended the December 29 meeting. Pound did not testify at the trial. Hargraves finally talked to publisher Wile. As we have stated, Wile told Hargraves to rewrite an editorial critical of plaintiff that had been submitted by Hargraves in order to make it stronger and to

call plaintiff a liar. That was done with devastating language that constituted a vicious and unwarranted attack upon plaintiff's character.

■ Defendants' final argument relates to damages. They concede that damages may be presumed upon a finding that a writing is libelous *per se.* (*Britton v. Winfield Public Library* (1981), 101 Ill. App. 3d 546, 428 N.E.2d 650; *cf.* 53 C.J.S., *Libel & Slander* sec. 262 (1948).) Having granted as much, they contend that the award of compensatory damages in the amount of $450,000 was wholly unwarranted and without any support in the evidence. Citing *Bloomfield v. Retail Credit Co.* (1973), 14 Ill. App. 3d 158, 302 N.E.2d 88, and *Gertz v. Robert Welch, Inc.* (1974), 418 U.S. 323, 41 L. Ed. 2d 789, 94 S. Ct. 2977, they assert that "substantial damages" may not be presumed. With such assertion we agree. With regard to punitive damages, defendants contend that it was an abuse of discretion for the court to award punitive damages, especially in the amount of $600,000, and, further, they contend that punitive damages in a libel action violate article I, section 4, of the Illinois Constitution of 1970 ("All persons may speak, write and publish freely, being responsible for the abuse of that liberty"). We agree with defendants that punitive damages were improperly awarded in this case, although for reasons different from those they advance. *Cf. Schutzenhofer v. Granite City Steel Co.* (1982), 93 Ill. 2d 208, 443 N.E.2d 563; *Motz v. Central National Bank* (1983), 119 Ill. App. 3d 601, 456 N.E.2d 958; Supreme Court Rule 366(a)(5) (87 Ill. 2d R. 366(a)(5)).

Proceeding in inverse order, we will consider first the issue of punitive damages. In *Fopay v. Noveroske* (1975), 31 Ill. App. 3d 182, 196-97, 334 N.E.2d 79, 91-92, we considered the propriety of an award of punitive damages in a defamation action. There we observed:

> "The defendant further argues that an award of punitive damages is precluded by the first amendment in libel actions governed by the *New York Times* rule. This argument has been consistently advanced and just as consistently rejected by the Supreme Court of the United States. (*Curtis Publishing Co. v. Butts*, 388 U.S. 130, 159, 18 L. Ed. 2d 1094, 87 S. Ct. 1975, 1994 (1967).) \*\*\*

> While the recent decision of *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 41 L. Ed. 2d 789, 94 S. Ct. 2997 (1974), will have wide-ranging impact on the law of defamation of private plaintiffs and their inability to recover punitive damages under a negligence standard, we do not read the decision as retreating from the Court's previous holdings that punitive damages are

properly recoverable under the actual malice text of *New York Times.* ***

So far as first amendment rights are concerned, a plaintiff who satisfies the *New York Times* rule may recover punitive damages; however, this is not to say that the States may not impose greater or additional tests as a condition to the recovery of punitive damages. (*Cantrell v. Forest Publishing Co.*, 419 U.S. 465, 42 L. Ed. 2d 419, 95 S. Ct. 465 (1974); *Davis v. Schuchat*, 510 F.2d 731 (D.C. Cir. 1975); see also *Buckley v. Littell*, 394 F. Supp. 918 (S.D.N.Y. 1975).)"

▮▮▮ It is well established in Illinois that punitive damages may be awarded when torts are committed with fraud, actual malice, deliberate violence or oppression, or when a defendant acts wilfully or with such gross negligence as to indicate a wanton disregard of the rights of others. (*Kelsay v. Motorola, Inc.* (1978), 74 Ill. 2d 172, 384 N.E.2d 353; *Warren v. Le May* (1986), 142 Ill. App. 3d 550, 491 N.E.2d 464.) While the purpose of punitive damages is punishment and deterrence, the initial question to be answered is whether the facts and circumstances of the particular case justify their imposition; this is a question of law. (*Hammond v. North American Asbestos Corp.* (1983), 97 Ill. 2d 195, 454 N.E.2d 210.) Nevertheless, because of their penal nature, punitive damages are not favored in the law, and the courts must take caution to see that punitive damages are not improperly or unwisely awarded. *Hammond v. North American Asbestos Corp.* (1983), 97 Ill. 2d 195, 454 N.E.2d 210; *Kelsay v. Motorola, Inc.* (1978), 74 Ill. 2d 172, 384 N.E.2d 353; *Warren v. Le May* (1986), 142 Ill. App. 3d 550, 491 N.E.2d 464.

▮▮ Since actual malice is the gist of plaintiff's libel action against defendants, it would ordinarily be thought to be one of those types of action that, with the proper findings, justifies an award of punitive damages. (*Fopay v. Noveroski* (1975), 31 Ill. App. 3d 182, 334 N.E.2d 79.) However, Illinois has come to recognize the proposition that if the factors that ordinarily justify an award of punitive damages are themselves the basic elements necessary to be established in order to recover compensatory damages, an award of punitive damages in addition to the compensatory damages constitutes an impermissible double recovery. This principle has been established and developed in the supreme court cases of *Dethloff v. Zeigler Coal Co.* (1980), 82 Ill. 2d 393, 412 N.E.2d 526, *Hammond v. North American Asbestos Co.* (1983), 97 Ill. 2d 195, 454 N.E.2d 210, and *Harris v. Manor Healthcare Corp.* (1986), 111 Ill. 2d 350, 489 N.E.2d 1374. In *Dethloff v. Zeigler Coal Co.* (1980), 82 Ill. 2d 393, 412 N.E.2d 526, the defend-

ant was guilty of a wilful trespass to plaintiff's land in the mining and removal of coal. The supreme court refused to permit the defendant to deduct its costs of production in the assessment of damages "to discourage misconduct of that nature." The court stated:

> "Turning to a contention of the plaintiffs, we hold that the trial court was correct in denying their claim that punitive damages were warranted. As we have observed above, the harsh rule on damages applicable to a wilful trespasser and converter of coal is by its very nature punitive. The plaintiffs were awarded damages far beyond what they would have received through royalty payments, and the defendant should not be liable for what would be in effect punitive damages upon punitive damages." (82 Ill. 2d 393, 413, 412 N.E.2d 526, 536.)

In *Hammond v. North American Asbestos Corp.* (1983), 97 Ill. 2d 195, 454 N.E.2d 210, the result was less direct in its bearing on the proposition before us, but nevertheless we regard it meaningful in its import. There the plaintiff was the wife of a worker who had been injured by the inhalation of asbestos fibers. The husband's action for damages had been barred by the statute of limitations, but the wife's action for loss of consortium was viable. In it she sought both compensatory and punitive damages. Compensatory damages were approved but punitive damages were denied because the wife's injury was derivative in nature. The court did, however, cite cases from the jurisdictions, as well as other authorities, that stood for the proposition that courts will not sanction a second award for punitive damages in a consortium action where a spouse has already received such an award. Such an additional award would serve to punish a defendant a second time and result in a double windfall to the injured party and the spouse. In *Harris v. Manor Healthcare Corp.* (1986), 111 Ill. 2d 350, 489 N.E.2d 1374, the plaintiff sought treble damages under section 3—602 of the Nursing Home Care Reform Act of 1979 (Ill. Rev. Stat. 1983, ch. 111½, par. 4153—602). A second count of plaintiff's complaint sought both compensatory and punitive damages based upon defendant's wilful and wanton misconduct. The supreme court refused to permit the recovery of both treble damages afforded under the statute and common law punitive damages:

> "[W]e agree with the parties that the treble-damages provision of the Act is punitive in nature (see *Atchison, Topeka & Santa Fe Ry. Co. v. People* (1907), 227 Ill. 270, 279; *People ex rel. Fahner v. Climatemp, Inc.* (1981), 101 Ill. App. 3d 1077, 1080-81), and that recovery of both treble damages and common law punitive damages would, under the circumstances of this case,

constitute a double recovery for a single injury." *Harris v. Manor Healthcare Corp.* (1986), 111 Ill. 2d 350, 361, 489 N.E.2d 1374, 1379.

 It is with the teaching of the foregoing cases, and with consideration given to the policy regarding punitive damages, that we hold that where actual malice is the gist of an action for libel, as here, both compensatory damages and punitive damages cannot be recovered. In essence and in fact, the nature of the conduct that will justify a recovery of compensatory damages is the same as the conduct that must be shown in order to recover punitive damages. Accordingly, to allow both would constitute a double recovery.

 We must agree with defendants that the amount of the award of compensatory damages is excessive. Although we consider defendants' attack upon plaintiff's character to be unduly harsh and vicious, the damages assessed must nevertheless bear a reasonable relationship to the harm suffered. We remain mindful, too, that in this case damages are presumed. Plaintiff himself gave no testimony regarding the harm he suffered. In fact, the only witness who testified as to plaintiff's damages was his wife, who stated that plaintiff was "distraught," "humiliated," "incensed," and "sleepless." Others testified as to plaintiff's excellent reputation in the community. We note, too, that the plaintiff was reelected as chairman of the St. Clair County board at the general election in 1982. Having due consideration for the nature of defendants' publication and for the extent of the suffering caused to the plaintiff, and acting pursuant to the authority of Supreme Court Rule 366(a)(5), we reduce the judgment for compensatory damages to $200,000.

Judgment for punitive damages reversed; judgment for compensatory damages reduced from $450,000 to $200,000 and affirmed.

Affirmed and modified in part; reversed in part.

KASSERMAN, J., concurs.

JUSTICE STEIGMANN, dissenting:

"[I]t must be obvious to the plainest minds, that opinions and inferences, and conjectural observations, are not only in many cases inseparable from the facts, but may often be more of the objects of the prosecution than the facts themselves; *** [I]t is manifestly impossible to punish the intent to bring those who administer the government into disrepute or contempt, without striking at the right of freely discussing public characters and

measures. ***" James Madison discussing the Sedition Act of 1798, as reported in 4 Elliot's Debates on the Federal Constitution, 575.

Although almost 200 years have passed since the enactment of our Federal Constitution, some of the controversies which confronted the Framers, particularly in the area of the first amendment, are just as fresh and difficult to resolve now as they were in 1789. This case on appeal is an example. The case concerns a libel judgment obtained by a local public official against a newspaper and its editorial page editor. The task as I see it is one James Madison and the other Framers would well have understood: balancing an individual's right to protect his reputation against a newspaper's right to criticize public officials. In order to resolve this issue, I will discuss at length the claim of the defendants, summarily rejected by the majority, that their allegedly defamatory statements are constitutionally protected opinion. I will attempt to determine how "inseparable," as James Madison put it, facts are from opinion in this particular case.

## I.

### DEFENDANTS' ASSERTION THAT THEIR STATEMENTS ARE CONSTITUTIONALLY PROTECTED EXPRESSIONS OF OPINION

In order to properly consider defendants' claim that the allegedly libelous statements are constitutionally protected expressions of opinion, it is necessary to trace the source of this claim and to discuss the criteria to be employed in determining its validity. Furthermore, the standards governing review of this claim and the policies which underlie those standards must be ascertained.

In my discussion, I will quote extensively from decisions of other courts that have wrestled with these issues and, in my judgment, analyzed them appropriately.

## A.

### THE SOURCE OF THE CLAIM THAT OPINION IS CONSTITUTIONALLY PROTECTED

In *Ollman v. Evans* (D.C. Cir. 1984), 750 F.2d 970 (*en banc*), *cert. denied* 471 U.S. 1127, 86 L. Ed. 2d 278, 105 S. Ct. 2662, a case I will be citing frequently, the court had before it a libel suit brought against two nationally syndicated columnists, Rowland Evans and Robert Novak, based upon allegedly defamatory material concerning the plaintiff that had appeared in their column. The district court granted the defendants' motion for summary judgment, concluding

that the column simply reflected the columnists' opinion and their interpretation of plaintiff Ollman's writings. The district court held that the opinion was absolutely protected by the first amendment, and the plaintiff appealed.

Because of the many similarities between the present case and *Ollman*, I believe that almost all of the *Ollman* court's analysis of the issues before it on appeal is applicable to this case as well. That court stated the following:

> "This case presents us with the delicate and sensitive task of accommodating the First Amendment's protection of free expression of ideas with the common law's protection of an individual's interest in reputation. It is a truism that the free flow of ideas and opinions is integral to our democratic system of government. *** At the same time, an individual's interest in his or her reputation is of the highest order. Its protection is an eloquent expression of the respect historically afforded the dignity of the individual in Anglo-American legal culture. A defamatory statement may destroy an individual's livelihood, wreck his standing in the community, and seriously impair his sense of dignity and self-esteem.
>
> The judiciary's task in accommodating these competing interests is by no means new: at common law, the fair comment doctrine bestowed qualified immunity from libel actions as to certain types of opinions in order that writers could express freely their views about subjects of public interest. However, since *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974), the nature of this accommodation has fundamentally changed. In *Gertz*, the Supreme Court in *dicta* seemed to provide absolute immunity from defamation actions for all opinions and to discern the basis for this immunity in the First Amendment. The Court began its analysis of the case by stating:
>
>> Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. But there is no constitutional value in false statements of fact. Neither the intentional lie nor the careless error materially advances society's interest in 'uninhibited, robust, and wide-open debate on the public issues.' [*Gertz v. Robert Welch, Inc.* (1974), 418 U.S. 323, 339-40, 41 L. Ed. 2d 789, 799, 92 S. Ct. 2997, 3007, quoting *New York Times Co. v. Sullivan* (1964), 376 U.S.

254, 270, 11 L. Ed. 2d 686, 700, 84 S. Ct. 710, 720.]

By this statement, *Gertz* elevated to constitutional principle the distinction between fact and opinion, which at common law had formed the basis of the doctrine of fair comment. *Gertz's* implicit command thus imposes upon both state and federal courts the duty as a matter of constitutional adjudication to distinguish facts from opinions in order to provide opinions with the requisite, absolute First Amendment protection." 750 F.2d 970, 974-75.

I concur with this reasoning and holding that opinion is constitutionally protected, and the Illinois Supreme Court has recently done so as well. (See *Owen v. Carr* (1986), 113 Ill. 2d 273, 280, 497 N.E.2d 1145, 1148.) I further agree that this court has a duty to distinguish fact from opinion when presented, as here, with a claim that allegedly defamatory material is constitutionally protected opinion.

### B.

FACT VERSUS OPINION: A DIFFICULT, BUT NECESSARY, DISTINCTION

Even though I believe that this court is under a constitutional duty to distinguish fact from opinion, I readily concede the difficulty of the task. Indeed, several courts and legal scholars have argued strongly that such a distinction is logically impossible or meaningless. As pointed out in *Ollman*, the Supreme Court in *Gertz* gave no guidance on this issue. Thus, I have searched elsewhere for an appropriate analysis.

Professor Prosser observed that the distinction between fact and opinion has "proved to be a most unsatisfactory and unreliable one, difficult to draw in practice." W. Prosser, Torts sec. 118, at 820 (4th ed. 1971). See also H. Titus, *Statement of Fact Versus Statement of Opinion—A Spurious Dispute in Fair Comment*, 15 Vand. L. Rev. 1203 (1962); C. Carman, *Hutchinson v. Proxmire and the Neglected Fair Comment Defense: An Alternative to "Actual Malice,"* 30 DePaul L. Rev. 1, 12-21 (1980); 7 Wigmore, Evidence sec. 1919, at 14 (Chadbourn rev. 1978); E. Cleary & M. Graham, Illinois Evidence sec. 701.1, at 443-44 (4th ed. 1984).

Speaking for the majority in *Ollman*, Judge Starr observed:

"In formulating a test to distinguish between fact and opinion, courts are admittedly faced with a dilemma. Because of the richness and diversity of language, as evidenced by the capacity of the same words to convey different meanings in different contexts, it is quite impossible to lay down a bright-line or me-

chanical distinction." 750 F.2d 970, 977-78.

Judge Starr also referred to Justice Holmes' much quoted statement in *Towne v. Eisner* (1918), 245 U.S. 418, 425, 62 L. Ed. 372, 376, 38 S. Ct. 158, 159: "A word is not a crystal, transparent and unchanged; it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used."

Perhaps the most eloquent discussion of the problem of distinguishing between fact and opinion is found in the concurring opinion of Judge Bork in *Ollman*:

> "I do not think these simple categories [fact versus opinion], semantically defined, with their flat and barren descriptive nature, their utter lack of subtlety and resonance, are nearly sufficient to encompass the rich variety of factors that should go into analysis when there is a sense, which I certainly have here, that values meant to be protected by the first amendment are threatened." 750 F.2d 970, 994.

"The difference between so-called 'fact,' and 'opinion,' is not a difference between opposites or contrasting absolutes, but a mere difference in degree with no recognizable line to mark the boundary." McCormick, Evidence sec. 11, at 22 (1954). In other words, there is a continuum linking the descriptive designations "fact" and "opinion" where, at their extremes, these different concepts may be readily identified and distinguished from each other; however, as one journeys along that continuum from the dock of one extreme to the dock of the other, one traverses a vast gray sea of uncertainty. Yet, as explained earlier, I believe it is this court's constitutional duty to chart this sea as best we can to enable us to decide whether, at a given point, our location is "fact" or "opinion."

## C.

### FACT VERSUS OPINION: THE ILLINOIS SITUATION

Twelve years have passed since the United States Supreme Court in *Gertz* stated that all expressions of opinion are constitutionally protected. During that time, only seven reported decisions of Illinois courts of review have made reference to the fact-versus-opinion distinction. Most of the remaining Illinois libel cases are concerned with questions such as the status of the plaintiff (public figure or public official), the innocent-construction rule, and proof of malice. The seven Illinois cases discussing fact-versus-opinion will be analyzed to ascertain what criteria they used in separating fact from opinion.

The first case is *Owen v. Carr* (1986), 113 Ill. 2d 273, 497 N.E.2d 1145. There, the allegedly libelous remarks were made by one attorney about another attorney in an article in a legal newspaper. The supreme court held that defendant Carr's statements were not libelous because when examined within the context of the article, they were reasonably susceptible to an innocent construction and also enjoyed the constitutional protection allowed expressions of opinion. In its application of the protected-expression-of-opinion rule, the court provided the following standard of analysis without further discussion: "The involved language must be considered in context to determine whether the statement should be construed to be an expression of opinion ***" 113 Ill. 2d 273, 280, 497 N.E.2d 1145, 1148, citing *inter alia, Ollman v. Evans* (D.C. Cir. 1984), 750 F.2d 970).

The second case is *Catalano v. Pechous* (1980), 83 Ill. 2d 146, 419 N.E.2d 350. In *Catalano*, the supreme court considered the defendants' argument that they were merely expressing constitutionally protected opinion when they reported that the plaintiff had approved a municipal contract because of a bribe. After reviewing several decisions from other jurisdictions, the supreme court concluded that an accusation of specific criminal behavior is a statement of fact and not constitutionally protected expression of opinion. *Catalano* offers no guidance for the present case in which the claimed protected expression of opinion does not involve an accusation of a specific criminal act, nor does that case suggest criteria to be applied when making fact-versus-opinion determinations.

The third Illinois case concerned with the fact-versus-opinion distinction is our earlier decision in the present case, *Costello v. Capital Cities Media, Inc.* (1982), 111 Ill. App. 3d 1009, 445 N.E.2d 13 (*Costello I*). The sole issue before the court in that appeal was whether the plaintiff had stated a cause of action in his complaint. By reversing and remanding for a trial on the merits, we expressed no opinion as to the potential respective merits of the parties' positions once evidence was presented. Because *Costello I* was before us only on the pleadings, our discussion therein of the fact-versus-opinion distinction was limited, containing no discussion of the criteria to be applied.

The next Illinois decision concerning fact-versus-opinion is *Naked City, Inc. v. Chicago Sun-Times* (1979), 77 Ill. App. 3d 188, 395 N.E.2d 1042. In that case, the first district appellate court, citing *Gertz*, held that expressions of opinion receive constitutional protection. However, beyond noting that "an examination of the amended complaint *** discloses that most of the plaintiffs' charges refer to opinions ***" (77 Ill. App. 3d 188, 191, 395 N.E.2d 1042, 1044), there

is no discussion of the criteria used to make that determination.

The remaining three opinions addressing the fact-versus-opinion distinction all apply a similar analysis, the one suggested by Restatement (Second) of Torts section 566 (1965). In order for a statement to be nonactionable, protected opinion under section 566, the factual basis for the expressed opinion must be included within such statement. The first case to apply this mode of analysis is *Howell v. Blecharczyck* (1983), 119 Ill. App. 3d 987, 457 N.E.2d 494. In *Howell,* the first district appellate court was presented with a claim that the plaintiffs were libeled in a flier published by the defendants. Citing *Gertz,* the defendant argued that their statements concerning the plaintiffs' qualifications for office were protected expressions of opinion. In agreeing with the defendants, the appellate court quoted approvingly from the then current district court decision in *Ollman v. Evans* (D.C. 1979), 479 F. Supp. 292. The only criterion discussed in *Howell,* however, in classifying a given statement as fact or opinion was whether all the facts supporting defendants' opinion were disclosed in the article.

The same analysis was used in another decision by the first district appellate court, *Matchett v. Chicago Bar Association* (1984), 125 Ill. App. 3d 1004, 467 N.E.2d 271. In *Matchett,* the defendants were charged with publicizing their finding that the plaintiff was found to be "Not Recommended" for a judicial office he was seeking. The court noted that "[e]ven if the language at issue charges a plaintiff with unfitness or lack of ability, *** it will not be actionable if the statement is clearly one of opinion, not of fact." (125 Ill. App. 3d 1004, 1009, 467 N.E.2d 271, 276.) Once again, however, as in *Howell, supra,* the only criterion discussed in distinguishing fact from opinion is the existence of undisclosed facts. Citing *Gertz,* the court stated: "[T]he first amendment does not preclude liability for a published statement that implies the existence of undisclosed facts that are both false and defamatory." 125 Ill. App. 3d 1004, 1010, 467 N.E.2d 271, 276.

Finally, in a recent decision by the fourth district appellate court, the Restatement analysis was specifically applied. In *Stewart v. Chicago Title Insurance Co.* (1987), 151 Ill. App. 3d 888, plaintiff alleged that he had been libeled by the contents of a letter of commitment to furnish title insurance covering plaintiff's farmland issued by defendants. In its analysis, the court found that the statements in the letter concerning the plaintiff were phrased in language indicating an opinion and that the letter showed a sufficient factual basis for the opinion. The court thus concluded that defendants' statements were protected opinion.

As I explain later, I disagree with the Restatement analysis applied in *Howell, Matchett,* and *Stewart.* I believe instead that the four factors from *Ollman,* discussed in the following section of this opinion, are far superior to the criterion of "undisclosed fact."

In summary, there are no clear guidelines in Illinois for the determination of fact-versus-opinion. It is necessary, therefore, to seek criteria discussed by courts of other jurisdictions which may be appropriate and helpful. Fortunately, my search leads me to just the right analysis in *Ollman.* I would adopt such analysis for Illinois.

D.

FACT VERSUS OPINION: THE OLLMAN FACTORS

In resolving the fact-versus-opinion issue with which it was presented in *Ollman,* the court began by noting the Supreme Court's declaration that expressions of opinion are absolutely privileged under the first amendment. To separate privileged statements of opinion from actionable statements of fact, the court of appeals looked to four important factors which it used in appraising the totality of the circumstances of the case. These four factors, which I will discuss individually, are 1) the statement's precision, 2) the statement's verifiability, 3) the literary context in which the statement was made, and 4) the public context in which the statement was made. The *Ollman* court further observed that these factors should be considered in assessing whether the average reader would view the statement as fact or opinion.

I am persuaded that the *Ollman* court has stated correctly the factors to be considered in a fact-versus-opinion case. Similarly, I agree that the issue presented is how the average reader will view the statement. The totality of all of the evidence before the court must be considered in resolving this issue. I emphasize, however, that these factors must be considered together, that no solitary criterion can be dispositive, and that ultimately the decision whether a statement is fact or opinion must be based on all the circumstances involved. (See *Janklow v. Newsweek, Inc.* (8th Cir. 1986), 788 F.2d 1300 (*en banc*).) *Janklow* is a recent decision of the Eighth Circuit which similarly adopts the *Ollman* analysis. For other cases which have recently adopted the *Ollman* standards, see *Scott v. News-Herald* (1986), 25 Ohio St. 3d 243, 496 N.E.2d 699, *El Paso Times, Inc. v. Kerr* (Tex. App. 1986), 706 S.W.2d 797, *Price v. Viking Press, Inc.* (D. Minn. 1985), 625 F. Supp. 641, *Henry v. Halliburton* (1985), 690 S.W.2d 775 (Mo. *en banc*); and *Mr. Chow v. Ste. Jour Azur S.A.* (2nd Cir.

## 1.

### FACTOR ONE—THE STATEMENT'S PRECISION

The first factor—the statement's precision—requires analysis of the common usage or meaning of the allegedly defamatory words themselves.

"We seek in this branch of our analysis to determine whether the allegedly defamatory statement has a precise meaning and thus is likely to give rise to clear factual implications. A classic example of a statement with a well-defined meaning is an accusation of crime. \*\*\* Post-*Gertz* courts have therefore not hesitated to hold that accusations of criminal conduct are statements 'laden with factual content' that may support an action for defamation. See, *e.g., Cianci v. New Times Publishing Co.,* 639 F.2d 54, 63 (2d Cir. 1980) \*\*\*." (*Ollman v. Evans* (D.C. Cir. 1984), 750 F.2d 970, 980.)

On the other hand, terms or statements that are "loosely definable" or "variously interpretable" cannot in most contexts support an action for defamation. "A statement such as, 'Mr. Jones is a despicable politician,' is a paradigm of opinion." (*Ollman v. Evans* (D.C. Cir. 1984), 750 F.2d 970, 978.) I believe readers to be considerably less likely to infer facts from an indefinite or ambiguous statement than one with a commonly understood meaning. I agree with the observation in *Janklow* that "[i]t is difficult to call a vague or imprecise statement a 'fact'; in the present context, moreover, doing so would place the First Amendment at the mercy of linguistic subtleties and fourth-ranked dictionary definitions." *Janklow v. Newsweek, Inc.* (8th Cir. 1986), 788 F.2d 1300, 1302.

## 2.

### FACTOR TWO—THE STATEMENT'S VERIFIABILITY

"Tied to the concept of precision is that of verifiability. If a statement cannot plausibly be verified, it cannot be seen as 'fact.' " *Janklow v. Newsweek, Inc.* (8th Cir. 1986), 788 F.2d 1300, 1302. Another way of stating this factor is the following: Is the statement objectively capable of proof or disproof? A reasonable reader will not believe that a statement lacking a plausible method of verification has specific factual content.

"Moreover, insofar as a statement is unverifiable, the First

Amendment is endangered when attempts are made to prove the statement true or false. Lacking a clear method of verification with which to evaluate a statement—such a labelling a well-known American author a 'fascist,' see *Buckley v. Littell*, [539 F.2d 882 (2d Cir. 1976), *cert. denied*, 429 U.S. 1062, 97 S. Ct. 785, 50 L. Ed. 2d 777 (1977)]—the trier of fact may improperly tend to render a decision based upon approval or disapproval of the contents of the statement, its author, or its subject." *Ollman v. Evans* (D.C. Cir. 1984), 750 F.2d 970, 981.

## 3.

### FACTOR THREE—THE LITERARY CONTEXT

The third factor involves "the full context of the statement—the entire article or column, for example—inasmuch as other, unchallenged language surrounding the allegedly defamatory statement will influence the average reader's readiness to infer that a particular statement has factual content." (*Ollman v. Evans* (D.C. Cir. 1984), 750 F.2d 970, 979.) This third factor goes beyond the four corners of a column, story, or editorial. It focuses on the category of the publication, its style of writing, and its intended audience. (See also *Owen v. Carr* (1986), 113 Ill. 2d 273, 280, 497 N.E.2d 1145, 1148 ("the involved language must be considered in context to determine whether the statement should be construed to be an expression of opinion").)

"The language of the entire column may signal that a specific statement which, standing alone, would appear to be factual is in actuality a statement of opinion. ***

Another consideration in this respect, *** is the inclusion of cautionary language in the text in which the statement at issue is found. *** The rationale typically advanced for this consideration is that cautionary language *** put[s] the reader on notice that what is being read is opinion and thus weaken[s] any inference that the author possesses knowledge of damaging, undisclosed facts. [Citation.] In a word, when the reasonable reader encounters cautionary language, he tends to 'discount that which follows.' [Citation.]" (*Ollman v. Evans* (D.C. Cir. 1984), 750 F.2d 970, 982-83.)

By quoting these remarks, I do not mean to imply that statements of fact that are libelous "warrant protection as constitutional expressions of opinions merely because they happen to be made on a newspaper's editorial page." (*Costello I*, 111 Ill. App. 3d 1009, 1016, 445 N.E.2d 13.) However, in determining in the first instance whether an

allegedly defamatory statement is fact or opinion, the placement and content of that statement, such as its location on an editorial page, is an extremely important consideration. The average reader expects to find opinion in columns and editorials and knows that they are usually too brief for any extensive discussion of the pertinent facts.

4.

### Factor Four—The Public Context

This factor serves to remind us that different types of writing have widely varying social conventions which signal to the reader the likelihood of a statement's being either fact or opinion. "It is one thing to be assailed as a corrupt public official by a soapbox orator and quite another to be labelled corrupt in a research monograph detailing the causes and cures of corruption in public service." *Ollman v. Evans* (D.C. Cir. 1984), 750 F.2d 970, 983.

In his *Ollman* concurrence, Judge Bork again spoke most eloquently concerning this public context criterion:

> "Those who step into areas of public dispute, who choose the pleasures and distractions of controversy, must be willing to bear criticism, disparagement, and even wounding assessments. Perhaps it would be better if disputation were conducted in measured phrases and calibrated assessments, and with strict avoidance of the ad hominem; better, that is, if the opinion and editorial pages of the public press were modeled on The Federalist Papers. But that is not the world in which we live, ever have lived, or are ever likely to know, and the law of the first amendment must not try to make public dispute safe and comfortable for all the participants. That would only stifle the debate." 750 F.2d 970, 993.

The similarities between the facts in *Ollman* and those of the present case become particularly evident in discussion of this fourth factor.

> "In short, it is well understood that editorial writers and commentators frequently 'resort to the type of caustic bombast traditionally used in editorial writing to stimulate public reaction.' [Citation.] Hence, in analyzing the distinction between fact and opinion, the court will take fully into account the different social conventions or customs inherent in different types of writing." 750 F.2d 970, 984.

I agree fully with the following observation made by the Eighth Circuit in *Janklow* with respect to this factor:

"It is true that the distinction between public and private figures which bears so heavily in many libel cases has no direct relevance here [citation]; *no* opinion is actionable, whether it concerns a private person or a public figure. However, when determining initially whether a statement is fact or opinion, it does a disservice to the First Amendment not to consider the public or political arena in which the statement is made and whether the statement implicates core values of the First Amendment. [Citation.] In fact, as Judge MacKinnon recognized, 'Judge Bork's skillful employment of "the concept of a public, political arena" is crucial to a proper understanding of the analysis Judge Starr elucidates.' *Ollman v. Evans* (D.C. Cir. 1984), 750 F.2d 1016 (MacKinnon, J., concurring)." (Emphasis in original.) *Janklow v. Newsweek, Inc.* (8th Cir. 1986), 788 F.2d 1300, 1303.

5.

### EFFECT OF *OLLMAN* FACTORS

I cannot conclude this analysis of the four *Ollman* factors without observing that, in my judgment, consideration of these factors concludes the inquiry which the court is to make when deciding whether a statement is a fact or an opinion. Once the court determines that the statement in question is opinion, not fact, then it does not matter what the mental state of the defendant (actual malice or intentional disregard) may have been in making that statement. Equally irrelevant under those circumstances is the question of whether the statement in question imputed an inability to perform or want of integrity in the discharge of duties of office or employment. See *Fried v. Jacobson* (1983), 99 Ill. 2d 24, 26, 457 N.E.2d 392, 394.

I earlier discussed the decisions of the first district appellate court in *Howell v. Blecharczyck* (1983), 119 Ill. App. 3d 987, 457 N.E.2d 494, and *Matchett v. Chicago Bar Association* (1984), 125 Ill. App. 3d 1004, 467 N.E.2d 271, and of the fourth district appellate court in *Stewart v. Chicago Title Insurance Co.* (1987), 151 Ill. App. 3d 888, wherein those courts deemed significant to the fact-versus-opinion analysis the issue of whether all the facts supporting a stated opinion were disclosed in the materials in question. These decisions, employing a criterion suggested by the Restatement (Second) of Torts section 566 (1965), indicated that a statement is more likely to be found to be an opinion if the facts supporting it are disclosed; otherwise, there is the assumption that the reader will infer the presence of undisclosed,

possibly defamatory facts. I believe this additional inquiry is unwieldly at best; it is also unnecessary if the four *Ollman* factors have been correctly utilized. Accordingly, I disagree with the Restatement analysis, and would adopt the following reasoning from *Ollman*:

"After deciding that a particular statement is opinion rather than fact, courts often undertake a second mode of analysis before wrapping the statement in the mantle of the First Amendment's opinion privilege. \*\*\* In our view, however, the tests already articulated are a sufficient aid in determining whether a statement implies the existence of undisclosed facts. \*\*\* A separate inquiry into whether a statement, already classified in this painstaking way as opinion, implies allegedly defamatory facts would, in our view, be superfluous." *Ollman v. Evans* (D.C. Cir. 1984), 750 F.2d 970, 984-85.

## E.

### APPLICATION OF THE *OLLMAN* FACTORS TO THE PRESENT CASE

In his complaint, plaintiff alleged that he was libeled by the following statements in defendants' editorial:

(1) "Jerry Costello lied to us."

(2) "There's no nicer way to put it, he (Costello) simply lied."

(3) "And when he (Costello) lied to us, he lied to you."

(4) "Well, he (Costello) lied."

(5) "But when the time came to make a decision, he (Costello) was up there sitting on his gavel."

(6) "He (Costello) did absolutely nothing to protect your interests."

(7) "Just think, we've got two more years of the Costello brand of lying leadership."

### 1.

### THE EDITORIAL'S PRECISION AND VERIFIABILITY

My analysis of the above statements begins with the first *Ollman* factor, and that is, the question of their precision based upon the common usage or meaning of the words themselves. Statements which have a precise meaning are more likely to give rise to clear factual implications than are statements which do not, and these more precise statements, therefore, are less likely to be understood by the average reader as expressions of opinion.

The gist of the plaintiff's complaint with regard to the above

statements is that they accuse him of lying when he made a campaign promise. It is at once apparent that the charge that someone has lied is far different in kind from a charge involving greater precision of language, such as an accusation of specific criminal behavior. Why this is so leads my analysis into the second of the *Ollman* factors—verifiability. Because of the close relationship between these first two factors, I shall discuss them jointly.

Determining whether a speaker has lied always involves the use of judgment by the listener. Judgment is used by the listener when considering these questions: (1) Did I correctly hear the speaker? (2) If so, did I misunderstand the speaker? (3) Did the speaker intend to say precisely what he said (in other words, given the opportunity to edit his remarks, would he have changed them to be more precise)? and (4) If the speaker has deviated from a promised path, is such deviation due to changed or unforeseen circumstances or to a lack of sincerity in his initial promise to follow that path?

Before concluding that a given speaker has lied, many listeners would likely challenge their own faculties to determine whether they correctly understood him in the first place. Other listeners, perhaps more reckless or less charitable, might hastily find bad motives and conclude that the speaker was lying. The point of all this is that people commonly understand the involvement of the accuser's judgment when one person accuses another of being a liar; no one is shocked that two people, hearing precisely the same speech and viewing precisely the same action subsequently taken by that speaker, might draw different conclusions as to whether or not the action was inconsistent with the speech, that is, whether or not the speaker lied about the action that would be taken. In other words, the accusation that a speaker lied lacks a precise core meaning, without which the accusation is unverifiable. When a speaker is accused of lying based upon statements made concerning intended future conduct, the closest one can come to verifying that accusation is to show a discrepancy between what was said and subsequently what was done.

The facts of this case demonstrate the applicability of the foregoing analysis to a charge that someone has lied. A substantial amount of the evidence in the record concerns who said what in the meeting between the plaintiff and the defendant newspaper's editorial board that occurred in the fall of 1980. The defendants claim that the plaintiff in that meeting positioned himself as a fiscal conservative who pledged to oppose the creation of a transit district for the Metro East area. As a result of that pledge, the newspaper endorsed Costello for election as county board chairman of St. Clair County. When the crea-

tion of such a district came before the county board after Costello's election, he did not speak publicly against it. The newspaper concluded that Costello had not done as he promised, and the editorial at issue in this case was published accusing Costello of lying.

Costello, of course, denies that he ever made any such pledge. He further disputes that he had authority to behave any differently than he did at the county board meeting at which the transit district was discussed and subsequently created. According to the rules of the St. Clair County board, Costello, as board chairman, had no power at that meeting to vote or speak on any matter before the board. His role was strictly that of parliamentarian. Thus the record raises the following issues: 1) What in fact did Costello say at the editorial board meeting? 2) Did the defendants at that meeting misunderstand him? 3) Given that Costello at that meeting was not speaking from prepared notes, did he convey accurately in his oral remarks his position on the transit district, or, due to imprecision of speech, did he unintentionally give an incorrect impression of his views on that subject? 4) Assuming that he made the pledge reported by the newspaper, were the limitations on his position as county board chairman the kind of circumstance which perhaps he had not foreseen when making that pledge and which would excuse his lack of action when the transit district was approved? and, 5) Did Costello fail to act in accordance with his promised course of action?

The conflict between the parties concerning these questions consumed a substantial portion of the trial and has continued in their briefs before this court. Having considered the trial record and the briefs on these points, it seems to me that while courts can adjudicate who said what to whom, they are ill-equipped to adjudicate who may have lied when making statements of intended future conduct.

I noted earlier that terms which are loosely defined or subject to various interpretations cannot in most contexts support an action for defamation. The terms "lying" and "liar" fit into these categories of vague terms. At its most extreme, "lie" means the intentional making of an untrue statement with intent to deceive. It is also possible for that word to mean unintentionally creating a false or misleading impression. These multiple uses are present in the very editorial which is the subject of this litigation. After accusing Costello of lying because he violated a campaign pledge to oppose the transit district, the newspaper reminds its readers that based upon that pledge, it endorsed Costello's candidacy and had previously told the readers that he was different from the run-of-the-mill politicians of the past. The editorial then states, "Now we wonder if we didn't lie to you." Obvi-

ously, the newspaper is not accusing itself of making an untrue statement with intent to deceive; it is merely indicating that by its endorsement, it unintentionally created a false impression among its readers towards Costello. Thus, "lie" is not only a word with multiple meanings, those multiple meanings are used within the body of the allegedly defamatory statement at issue in this case, thereby reminding the reader of that word's lack of precise meaning.

Determining whether a given speaker has lied necessarily involves the judgment of the listener. In almost all cases, one can only offer an opinion on that issue, which is precisely what the defendants did in their editorial in this case. Accordingly, I find that defendants' statements that the plaintiff lied concerning the transit district to be both imprecise and unverifiable. With regard to the fifth and sixth statements that Costello claims libeled him, they too lack precision and verifiability. The fifth statement, that Costello "sat on his gavel" is obviously nothing more than a figure of speech and need not be discussed further. The sixth statement, that Costello "did absolutely nothing to protect your interests," is hyperbole which necessarily involves the judgment of its author. That statement does not assert that Costello did nothing, but instead states that any action he took did not "protect your interests." By its very terms, that statement deals with an uncertain, subjective concept—the readers' interests. There can be no doubt that reasonable people could disagree not only about what those interests are, but also about whether any action Costello took was sufficient to protect them.

## 2.

### THE EDITORIAL'S LITERARY CONTEXT

The literary context of the allegedly defamatory remarks about Costello could not be stronger in suggesting to the average reader that what he or she is reading is opinion, not fact. The statements in question appear on a page of the newspaper under the heading in bold type, "opinions." Furthermore, the box on the page in which the statements are contained bears the title, "our viewpoint." Attached as an appendix to this dissent is a copy of the editorial page in question in order to make the context of these remarks clearer.

Common experience teaches that almost all newspapers are composed of two parts: 1) articles reporting newsworthy events in a supposedly unbiased fashion, and 2) columns and editorials in which opinions are expressed concerning those events. While the mere fact that statements appear on an editorial page does not guarantee that they

will always be found to be constitutionally protected opinion, their presence in that literary context is a most significant factor in any fact-versus-opinion determination. I agree with the following observation from *Ollman* as to why this is so:

"The reasonable reader who peruses an Evans and Novak column on the editorial or Op-Ed page is fully aware that the statements found there are not 'hard' news like those printed on the front page or elsewhere in the news sections of the newspaper. Readers expect that columnists will make strong statements, sometimes phrased in a polemical manner that would hardly be considered balanced or fair elsewhere in the newspaper. [Citation.]" *Ollman v. Evans* (D.C. Cir. 1984), 750 F.2d 970, 986.

3.

## The Editorial's Public Context

The public context of the allegedly defamatory statements in this case is perhaps the single strongest point the defendants possess in their argument that their statements are opinion, not fact. That context, stated most bluntly, is this: plaintiff, a public official holding elective office, complains of a newspaper's editorial in which he is severely criticized for his performance in office. This libel suit, therefore, strikes at the very core of the values sought to be protected by the first amendment—vigorous, untrammelled criticism by a free press of governmental officials and actions. I agree with the following observations that other courts have made on this subject:

"Certainly, speech about government and its officers, about how well or badly they carry out their duties, lies at the very heart of the First Amendment. [Citations.] It is vital to our form of government that press and citizens alike be free to discuss and, if they see fit, impugn the motives of public officials." *Janklow v. Newsweek, Inc.* (8th Cir. 1986), 788 F.2d 1300, 1304-05.

"[I]t is of the utmost consequence that the people should discuss the character and qualifications of candidates for their suffrages. The importance to the state and to society of such discussions is so vast and the advantages derived are so great, that they more than counterbalance the inconvenience of private persons whose conduct may be involved, and occasional injury to the reputations of individuals must yield to the public welfare, although at times such injury may be great. The public

benefit from publicity is so great, and the chance of injury to private character so small, that such discussion must be privileged." *Coleman v. MacLennan* (1908), 78 Kan. 711, 724, 98 P. 281, 286.

In sum, I believe there are few other types of discussions of public concern which could make a greater claim to First Amendment protection than the one involved in this case.

### 4.

#### FINDING

Because the allegedly defamatory statements here are imprecise, unverifiable, presented in a forum entitled "opinions" where spirited writing is expected, and involve criticism of a public official's performance of his public office, I would find all of the statements complained of to be constitutionally protected opinion.

### F.

#### FACT VERSUS OPINION: THE STANDARD OF REVIEW

In this opinion, I have provided a detailed analysis of the criteria that should be used in a fact-versus-opinion determination. I also must discuss the standards by which those criteria should be reviewed. The need for this discussion arises from the fact that fundamental constitutional protections are involved.

I first note the inherent threat to the first amendment whenever the press is charged in a civil action with defamation. Noting this threat does not suggest that the press is immune if it libels someone; it merely suggests that such cases should be handled by the courts with a heightened awareness of what is at stake. Courts should refuse to engage in fact-versus-opinion nitpicking in the face of the constitutionally guaranteed freedom of expression.

"[I]n the accommodation of the conflicting concerns reflected in the First Amendment and the law of defamation, the deep-seated constitutional values embodied in the Bill of Rights require that we not engage, without bearing clearly in mind the context before us, in a Talmudic parsing of a single sentence or two, as if we were occupied with a philosophical enterprise or linguistic analysis. Ours is a practical task, with elemental constitutional values of freedom looming large as we go about our work. And in that undertaking, we are reminded by *Gertz* itself of our duty 'to assure to the freedoms of speech and

press that "breathing space" essential to their fruitful exercise.' *Gertz, supra,* 418 U.S. at 342, 94 S. Ct. 3008. For the contraction of liberty's 'breathing space' can only mean inhibition of the scope of public discussion on matters of general interest and concern. *The provision of breathing space counsels strongly against straining to squeeze factual content from a single sentence in a column that is otherwise clearly opinion.*" (Emphasis added.) *Ollman v. Evans* (D.C. Cir. 1984), 750 F.2d 970, 991.

Furthermore, if a libel case in which a claim of constitutionally protected opinion is raised has not been dismissed at the outset, courts must fully review the evidence to ensure that constitutional principles are correctly applied in the balancing of interests. As the Supreme Court stated in *Greenbelt Cooperative Publishing Association v. Bresler* (1970), 398 U.S. 6, 11-12, 26 L. Ed. 2d 6, 13-14, 90 S. Ct. 1537, 1540-41, a libel case:

" '[T]his Court's duty is not limited to the elaboration of constitutional principles; we must also in proper cases review the evidence to make certain that those principles have been constitutionally applied. \*\*\* We must "make an independent examination of the whole record," \*\*\* so as to assure ourselves that the judgment does not constitute a forbidden intrusion on the field of free expression.' [Citation.]

\* \* \*

Because the threat or actual imposition of pecuniary liability for alleged defamation may impair the unfettered exercise of these First Amendment freedoms, the Constitution imposes stringent limitations upon the permissible scope of such liability."

Finally, courts must constantly have in mind the high purpose criticism of the government serves in a democracy. Perhaps the Illinois Supreme Court over 60 years ago stated best the stakes in a libel case such as the present one.

"[I]t is clear that a civil action is as great, if not a greater, restriction [upon freedom of speech] than a criminal prosecution. If the right to criticize the government is a privilege which \*\*\* cannot be restricted, then all civil as well as criminal actions are forbidden. A despotic or corrupt government can more easily stifle opposition by a series of civil actions than by criminal prosecutions. \*\*\* It follows, therefore, that every citizen has a right to criticize an inefficient or corrupt government without fear of civil as well as criminal prosecution. This

absolute privilege is founded on the principle that it is advantageous for the public interest that the citizen should not be in any way fettered in his statements, and where the public service or due administration of justice is involved he shall have the right to speak his mind freely." *City of Chicago v. Tribune Co.* (1923), 307 Ill. 595, 607-08, 139 N.E. 86, 90.

## II.

### THE MAJORITY OPINION

The majority opinion rejects the application of the *Ollman* standards to the present case and, alternatively, chooses to adhere to the innocent-construction rule. As a basis for doing so, the majority asserts that 1) the Illinois Supreme Court has considered and rejected the *Ollman* standards, 2) the protected-expression-of-opinion rule is not clearly established, 3) the *Ollman* standards do not simplify the court's task of distinguishing fact from opinion, and 4) the innocent-construction rule is the preferred criterion to apply in making such distinctions. I believe the majority opinion to be clearly in error on all four points.

### A.

### THE *OLLMAN* STANDARDS

The majority opinion cites the recent Illinois Supreme Court case of *Owen v. Carr* (1986), 113 Ill. 2d 273, 497 N.E.2d 1145, in support of its position that the *Ollman* standards have not been accepted by the court. But the majority opinion omits the supreme court's citation to *Ollman* in the quotation from *Owen* cited by the majority opinion. (153 Ill. App. 3d at 966.) When the supreme court's citations are included in the quoted paragraph from *Owen*, it becomes clear that the *Owen* court did not reject the *Ollman* standards at all. On the contrary, the supreme court gave implicit approval to their use. The same paragraph quoted by the majority opinion, with citations included, is set forth as follows:

"We observe, too, that the Supreme Court has recognized a constitutional privilege for expressions of opinion. (*Gertz v. Robert Welch, Inc.* (1974), 418 U.S. 323, 41 L. Ed. 2d 789, 94 S. Ct. 2997.) Whether a statement is to be judged to be one of fact or one of opinion is a matter of law (*Lewis v. Time Inc.* (9th Cir. 1983), 710 F.2d 549), and the involved language must be considered in context to determine whether the statement

should be construed to be an expression of opinion (*Old Dominion Branch No. 496, National Association of Letter Carriers v. Austin* (1974), 418 U.S. 264, 41 L. Ed. 2d 745, 94 S. Ct. 2770; *Ollman v. Evans* (D.C. Cir. 1984), 750 F.2d 970). As stated, the statements may reasonably be viewed as an expression of Carr's opinion regarding his client's allegations against Owen. Carr's acknowledgment that he did not know the specific information Owen gave the Judicial Inquiry Board shows that his statement was not a factual charge and actionable as a matter of law." *Owen v. Carr* (1986), 113 Ill. 2d 273, 280-81, 497 N.E.2d 1145, 1148.

It is difficult to read the above-quoted paragraph without inferring approval by the Illinois Supreme Court of the *Ollman* analysis. Certainly, there is no basis to find, as the majority opinion has, any disapproval.

B.

### Protected Expression of Opinion

The majority opinion attempts to bolster its rejection of application of the protected-expression-of-opinion rule in this case by suggesting that the rule does not exist. For example, on page 964, the majority opinion quotes from *Ollman* for the proposition that the United States Supreme Court has not clearly recognized protected opinion, but merely mentioned it "in *dicta*" in *Gertz, supra.* The majority opinion apparently overlooked the much stronger language of our own supreme court in *Owen, supra*:

"We observe *** that the Supreme Court has recognized the constitutional privilege for expressions of opinion (*Gertz v. Robert Welch, Inc.* (1974), 418 U.S. 323, 41 L. Ed. 2d 789, 94 S. Ct. 2997)" *Owen v. Carr* (1986), 113 Ill. 2d 273, 280, 497 N.E.2d 1149.

In this quoted passage, the court clearly recognizes the existence of the protected-expression-of-opinion rule. Yet the majority, in an attempt to weaken the statement's impact, refers to it as "*dicta.*" The majority opinion further asserts that the court in *Owen* decided the case on the basis of the innocent-construction rule, merely mentioning the protected-expression-of-opinion rule, without applying it. However, language in *Owen*, apparently overlooked by the majority opinion, indicates that it was not the court's intention to state the rule in *dicta*, but, on the contrary, to apply it as a holding in the case:

"As we have said above, however, Carr's statements, when examined within the context of the article, are reasonably susceptible to an innocent construction, *and also enjoy the constitutional protection allowed expressions of opinion.*" (Emphasis added.) 113 Ill. 2d 273, 282, 497 N.E.2d 1145, 1149.

The majority opinion implies that the protected-expression-of-opinion rule does not exist; the Illinois Supreme Court has held to the contrary. As an intermediate appellate court of this State, we are required to decide questions of Federal constitutional law based on Illinois Supreme Court interpretations of United States Supreme Court decisions. Here, the Illinois Supreme Court has analyzed the *Gertz* decision of the United States Supreme Court and has concluded that the United States Supreme Court has recognized a constitutional privilege for expressions of opinion. In my judgment, that conclusion ends our inquiry.

## C.

### DIFFICULTY OF ANALYSIS

The most interesting reason proffered by the majority opinion for the rejection of the *Ollman* standards is the claim that their implementation "has not made a court's task in a defamation case any more simple or any more infallible." (153 Ill. App. 3d at 965.) The majority opinion then cites *Janklow v. Newsweek, Inc.* (8th Cir. 1986), 788 F.2d 1300 (*en banc*), for the hardly startling proposition that while opinion is absolutely protected under the first amendment, it is hard to draw a bright line between "fact" and "opinion." 153 Ill. App. 3d at 965.

As discussed in part IB of this dissenting opinion, *supra,* I am in total agreement with the difficulty of making the fact-versus-opinion distinction. Notwithstanding this difficulty, however, it is our constitutional responsibility to do the best we can. The beauty of the *Ollman* standards is that they provide some clear-cut criteria upon which to make this difficult determination. The majority opinion complains that these standards "are lacking in any objective specificity." (153 Ill. App. 3d at 966.) It then concludes, as it claims does the Illinois Supreme Court, that the innocent-construction rule can be more easily applied and "certainly more easily understood." Almost the entire discussion in the majority opinion, however, concerning the issue of making the fact-versus-opinion distinction concerns why the *Ollman* standards fail to work; there is no discussion at all as to why the innocent-construction rule standards do work. Indeed, the entire

analysis in the 18-page majority opinion concerning the application of the innocent-construction rule to the defendants' claim that the allegedly defamatory statements in question are constitutionally-protected opinion is the following:

> "We are fully cognizant that there is a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open (*New York Times, Inc. v. Sullivan* (1964), 376 U.S. 254, 11 L. Ed. 2d 686, 84 S. Ct. 710), and that candidates for public office, having 'thrust themselves to the forefront of particular public controversies *** have voluntarily exposed themselves to increased risk of *** defamatory falsehood.' (*Gertz v. Robert Welch, Inc.* (1974), 418 U.S. 323, 345, 41 L. Ed. 2d 789, 808, 94 S. Ct. 2997, 3010.) However, that said and considered, we have determined that the defendants cannot claim the protection afforded by the first amendment as a defense to plaintiff's action, for the editorial in question goes well beyond the bounds of protected criticism." (153 Ill. App. 3d at 967.)

It should be noted that no explanation is given as to why this is so. Apparently, from anything one can infer from the foregoing language, my colleagues read the allegedly defamatory statements in question and simply decided that they "went well beyond the bounds of protected criticism." There is no suggestion as to how they made that determination, nor is there any guidance for trial courts or other courts of review who might be called upon to make similar determinations in the future. Instead, this holding represents *ad hominem* judicial decision making at its worst. It is nothing more than the civil law application of obscenity law made simple: "I may not know how to define it, but I know it when I see it." Whatever deficiencies there may be in the *Ollman* standards, at least there are standards; the innocent-construction rule, on the other hand, provides none at all.

## D.

### THE INNOCENT-CONSTRUCTION RULE

The claim of the majority that the Illinois Supreme Court deems the innocent-construction rule to be more easily applied and understood than the *Ollman* standards borders on the ridiculous. In *Owen*, the supreme court said that "the [innocent construction] rule has been the subject of strong criticism." (*Owen v. Carr* (1986), 113 Ill. 2d 273, 278, 497 N.E.2d 1145, 1147.) The court then stated the fol-

lowing:

"This court observed in *Chapski v. Copley Press* (1982), 92 Ill. 2d 344, 349:

'It [the rule] has been the subject of much critical commentary (see, *e.g.*, Polelle, *The Guilt of the 'Innocent Construction Rule' in Illinois Defamation Law,* 1 N.I.U. L. Rev. 181 (1981)); (Symposium, Libel and Slander in Illinois, 43 Chi. Kent L. Rev. 1 (1966)); cf. Comment, *The Illinois Doctrine of Innocent Construction: A Minority of One,* 30 U. Chi. L. Rev. 524 (1963); Stonecipher & Trager, *The Impact of Gertz on the Law of Libel in Illinois,* S.I.U. L.J. 73 (1979)), and considered to be a resurrection of the long-discarded 16th- and 17th- century English rule of *mitior sensus* (Eldredge, *The Law of Defamation* sec. 24, at 161 (1978)).'

This court stated in *Chapski* that in the application of the rule there had been inconsistent and contradictory holdings, including a tendency of courts to 'strain to find unnatural but possibly innocent meanings of words where such a construction is clearly reasonable and a defamatory meaning is far more probable.' (*Chapski v. Copley Press* (1982), 92 Ill. 2d 344, 350-51.)" 113 Ill. 2d 273, 278-79, 497 N.E.2d 1145, 1147.

It is doubtful that the Illinois Supreme Court has ever indicated greater reluctance in continuing to apply a rule of law than it did when it applied the innocent-construction rule in the *Owen* case. The supreme court gave every indication of looking for, and being ready to apply, a new standard of interpretation when the appropriate case comes before it. If the appropriate case comes before us first, as I believe it has in the instant case, we need not wait for the Illinois Supreme Court to adopt formally the *Ollman* standards before we do. The facts of this case present us not only with the opportunity, but with the obligation to do so, and no decision by the Illinois Supreme Court suggests otherwise.

In 1962, when the Illinois Supreme Court first stated the innocent-construction rule, it was defined as requiring "that words allegedly libelous that are capable of being read innocently must be so read and declared nonactionable as a matter of law." (*John v. Tribune Co.* (1962), 24 Ill. 2d 437, 442, 181 N.E.2d 105, 108.) Despite the criticism which has been lodged against that rule (and acknowledged by the Illinois Supreme Court), it may have some useful role in some areas of libel law, such as determining, for instance, whether allegedly defamatory statements can or should be interpreted as referring

to the plaintiff or to someone other than the plaintiff. It may also have some use in determining whether a particular statement of fact may be actionable *per se*. However, it is of no use at all in resolving fact-versus-opinion questions. To say that the innocent-construction rule requires that statements which can reasonably be read as expressions of opinion must be so read is simply to beg the question. How is one to tell whether the statement may reasonably be so read and what standard is one to apply? The majority opinion in this very case is an example of the standardless decision making created by application of the innocent-construction rule to a fact-versus-opinion issue.

## III.

### CONCLUSION

The public will be shocked to learn, as they should be, that in 1987 in the United States of America a local politician could collect hundreds of thousands of dollars in a libel case solely because he was criticized harshly and called a liar by a local newspaper. By permitting such a result, the majority opinion is not merely wrong, but truly constitutes a threat to one of our most important freedoms— the freedom of the press to criticize vigorously, and even unpleasantly, public officials in the execution of their official duties. Even if the damages in this case were reduced further to a fraction of what they originally were assessed at, that reduction would be insufficient to avoid seriously crimping the willingness of the press to express harsh opinions concerning governmental officials. Very few weeklies and small daily newspapers could easily withstand the six-figure judgment that my colleagues have seen fit to award to the plaintiff in this case, a judgment rendered against this newspaper because it believed and reported that a governmental official lied.

In rejecting the application of the *Ollman* standards to the present case, the majority states the following:

> "Any defendant in any defamation suit, no matter how shrill, acerbic, profane, or accusatorial the utterance may be, can always say, 'Why, I was only expressing an opinion, and that's privileged.' We do not believe the law of defamation should digress so far, which it could, if the 'protected expression of opinion' rule is given full sway. The innocent-construction rule does not permit such an extreme digression." (153 Ill. App. 3d at 967.)

What the majority fails to realize is that if the utterance in question

was in fact an opinion, then the speaker is absolutely correct in his claim that his statement is privileged. As the United States Supreme Court has reminded us, there is no such thing as a false idea. (See *Gertz v. Robert Welch, Inc.* (1974), 418 U.S. 323, 339-40, 41 L. Ed. 2d 789, 804-05, 94 S. Ct. 2997, 3007.) There is also no such thing as a false opinion. The first amendment protections we supposedly all cherish guarantee us the right to express shrill, acerbic, profane, or accusatorial *opinions*. And, of course, the more shrill and profane the language is, the more likely that readers or hearers will perceive it as opinion as opposed to fact.

The worthy purpose of libel law is to protect injury to reputation, not to feelings. The judgment in this case, however, seems to be based not upon damage to the plaintiff's reputation, but upon disapproval by the courts of the tone and tactics of the defendants. Yet the price of a free press is the forbearance of an irresponsible press, at least to the extent it attacks politicians in expressions of opinion. That a particular politician, as a result of such attacks, may be "distraught," "humiliated," "incensed," and "sleepless," (153 Ill. App. 3d at 976) as the plaintiff in this case claimed to be, is totally irrelevant. Mr. Costello was not drafted to be chairman of the St. Clair County board, and if he or other politicians have their sensibilities offended when the press accuses them of lying, they can always resign their public positions and thereby avoid the increased scrutiny those positions bring.

The *Belleville News-Democrat* may be a scandal sheet, Richard Hargraves may be a bad editor, his publisher may be driven by venal motives, and the investigation and reporting that led to the litigation in this case may be a disgrace to journalism; however, as long as the allegedly defamatory statements in this case are opinion, not fact, none of these other factors matter. Because I believe the majority opinion to be egregiously in error in concluding that the statements in question were not opinion, I respectfully dissent.

APPENDIX

News-Democrat

# opinions

Page 4 Section A Wednesday December 31 1980

Darwin C Wile
Publisher

Joseph A Weiler
Editor

Richard N Hargraves
Editorial Page Editor

## — our viewpoint —

# St. Clair County Board refuses to give you a chance to decide

Well, your public officials have done it again. Done what?

Why, what they seem to enjoy doing most, raising your taxes without your consent.

You never had a chance, not from the moment the Bi-State Development Agency convinced area mayors that the world would somehow end if Bi-State had to cease its Illinois operations.

They — Bi-State and your public officials — regard this whole thing. Their entire strategy was to deny you the opportunity to voice your opinion of an additional tax.

What began as a legitimate attempt by the General Assembly to equalize the burden of transit district payments in various areas of the state ended with the creation of a transit district that can tax you up to ¼ of a cent on almost everything you buy.

It all began a year or more ago when the General Assembly decided that Bi-State had mooched enough from the state coffers. Legislators said they would no longer subsidize the system — above a minimal amount — unless $1 million in matching funds was raised from Madison, St. Clair and Monroe counties.

Nothing much happened for a long time. Bi-State officials, knowing they could get their way only if they produced an emergency situation, refused to produce any statistics on their Illinois operations. And area mayors, left without the information they needed, simply put off making any sort of a decision on how to provide the local match.

Finally, at the last moment, Bi-State started its scare tactics. Executive Director Charles Houghton told local officials that Bi-State would drastically cut its service — such that it is — if the matching funds weren't provided. The only way to provide those funds, he intimated to confused local officials, was to give Bi-State the power to tax.

He hammered home his point at meeting after meeting, poking holes in every other proposal until he got the one he wanted. While it didn't give taxing powers directly to Bi-State, it did the next best thing. It let county boards create a taxing district to do the taxing for Bi-State.

Knowing the problems any other bus company would have meeting federal requirements, Houghton knew he finally had his taxing plan.

The General Assembly — at the urging of Rep Monroe Flinn, D-Cahokia, and Sen. Sam Vadalabene, D-Edwardsville, rammed through a bill giving county boards the power to impose as much as a ¼-cent sales tax. When some legislators — led by Rep Frank Watson, R-Greenville — tried

to amend the bill to let voters decide if they wanted to be taxed, Flinn and company persuaded them.

After all, they said, there is nothing to prevent local officials from holding an advisory referendum in November. Legislators like advisory referendums — like the ill-fated Thompson Proposition — because they're easy to ignore.

So the taxing bill went to Gov. James R. Thompson's desk, where it sat and sat and sat.

Finally, when there was not enough time to establish any kind of referendum at the November elections, Thompson signed the bill.

The burden then came back to the local level, with county boards forced to decide between imposing the tax and asking for cabinet input.

Here's where Bi-State re-entered the act.

Under the state's new election consolidation law, a referendum could only be held April 7. So, naturally, Houghton and his lackeys said they couldn't wait that long, that they'd cut service Jan. 1 if the taxing districts weren't created.

The Madison County Board was the first to cave in to the pressure. Board members created Houghton's taxing district, giving themselves a year to study alternatives.

Then it was the turn of the Monroe County Board. These stalwart fellows weren't as frightened of Houghton as were their big-city counterparts. They created the taxing district, but only for six months. And they set an April 7 referendum to give voters the chance to decide if they wanted the tax to continue.

But the success or failure of the plan rested in St. Clair County, where the largest amount of bus service is offered. Nothing much happened as St. Clair County Board members dawdled. A study committee made its report — sort of — and public meetings were held.

But when push came to shove, board members voted as you knew they would. They voted to create the district for a year and to conduct an "advisory" referendum in April.

Finally, Chuck Houghton, Mr. Missouri, had his tax.

And you didn't get to say one word about it.

Aren't you glad to know that your public officials — the men and women you elect to represent you — are doing the bidding of Houghton and his Missouri friends?

Aren't you glad to know that your public officials value your opinion so highly that they refused to conduct a binding referendum giving you the power to accept or prevent the transit tax?

Aren't you glad to know where you stand?

— RICHARD N HARGRAVES

# Costello blew his first chance

Jerry Costello lied to us.

There's no surer way to put it, he simply lied. And, when he lied to us, he lied to you.

He said he was going to be a tough county board chairman, especially when board members wanted to spend taxpayers' money.

He said he would militantly oppose the implementation of any new tax without first seeking the voters' approval through a referendum.

He said he would lead the County Board down the proper paths, protecting the rights of the taxpayers.

Well, he lied.

He didn't do any of these things Monday night, thereby breaking his most sacred campaign promise at his very first meeting.

The County Board had an opportunity to conduct a binding referendum, asking you if you wanted to pay a new sales tax to support the Bi-State bus system. That's the very thing Costello had pledged he would do. He had promised, in the strongest possible terms, that he would let the voters decide.

But when the time came to make a decision he was up there sitting on his gavel.

Some leader!

You couldn't tell him from any other politician in the bunch. He did absolutely nothing to protect your interests.

To say we're disappointed is too mild; we're irate. We supported Costello's election because of what he told us. We told you what he said and how we thought he was different from the run-of-the-mill, Touchette-dominated Democrats of the past.

Now we wonder if we didn't lie to you.

Maybe Costello isn't different.

Maybe Costello didn't mean any of the things he said.

Maybe his opponent, Republican Larry Roseneck, was right when he said Jerry Costello was nothing more than another patronage-oriented political hack.

How are we supposed to tell otherwise?

Jerry Costello asked for a chance to prove himself and, in his very first meeting, he blew it.

Just think, we've got two more years of the Costello brand of lying leadership.

Doesn't that thrill you?

— RICHARD N HARGRAVES